## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Sidney B. Brooks

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy Case No. |
| STAR ACQUISITION III, LLC | ) | 04-10121-SBB |
| TAX ID 84-1457843 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER REGARDING CONFIRMATION OF SECOND AMENDED PLAN OF REORGANIZATION

This MATTER comes before the Court upon the Court's Order Approving Disclosure Statement and Setting Confirmation Hearing, the Conley P. Smith and Conley P. Smith, LLC ("CPS") and Orca Onshore, L.P. ("Orca") Objection to Debtor's Second Amended Plan of Reorganization, and the Debtor's Memorandum Brief in Support of Confirmation. The Court has reviewed the Debtor's Second Amended Plan of Reorganization ("Plan"), the Disclosure Statement for Debtor's Second Amended Plan of Reorganization ("Disclosure Statement"), heard arguments of counsel, and finds and concludes as follows.

## ISSUE PRESENTED

The issue before the Court is whether the Debtor's proposed Second Amended Plan of Reorganization can be confirmed over the objection of CPS and Orca. The objection is narrow and focused: that the Plan is not proposed in good faith as required by 11 U.S.C. § 1129(a)(3). All other requirements for confirmation are not contested by the objecting creditors.

The objecting creditors maintain that creditors in the same class are treated disparately under the Plan—or that one creditor, CPS, is being treated in an unfair, discriminatory fashion—and that fails to meet the good faith standard for confirmation under the Code.

The Court concludes that the Plan does not unfairly discriminate against CPS, that the disparate treatment is really more in the nature of a simple claims objection, and the treatment of the CPS claim in the Plan is within the sound judgment and discretion of the Plan's Proponent. The Court finds the Plan and the Plan's Proponent are in good faith.

## FINDINGS OF FACT

1.      On January 5, 2004, Star Acquisition III, LLC (the "Debtor") filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is a limited liability company formed under the laws of the State of Colorado. Prior to the bankruptcy filing, the Debtor was the owner of various oil and gas properties located in the States of Colorado, Oklahoma, Wyoming, Kansas, Louisiana, Mississippi and Texas (the "Properties").

2.      Prior to the bankruptcy filing, the Debtor's affiliate and part-owner, Star Resources, LLC ("Resources") was the operator of the majority of the oil and gas wells in which the Debtor had an interest.  Resources performed accounting functions for the Debtor and contracted for various services on behalf the Debtor.

3.      On or about January 21, 2004, the U.S. Trustee appointed a Creditors' Committee ("Committee") in this case, which consisted of 7 individuals.  The Committee currently consists of 5 individuals, and CPS is the Chairman of the Committee.

4.      The Debtor has presented its Second Amended Plan of Reorganization for confirmation by the Court.  The Plan contemplates a distribution of approximately $1.4 million in cash representing the proceeds from the sale of the Debtor's Properties.

5.      Conditioned on confirmation of the Plan, Resources, the Debtor's affiliate, has agreed to subordinate its general unsecured claim of approximately $655,000 to the claims of other unsecured creditors in exchange for a release to Resources and its affiliates.  This agreement, and other concessions made for the benefit of creditors, was negotiated by the Committee, and the Committee supports confirmation of the Plan.

6.      The Plan also contemplates that the Debtor and the Committee will pursue objections to the claim of CPS and certain other creditors.  CPS filed a Proof of Claim, Claim No. 33, asserting a secured claim of $1.5 million (the "CPS Claim").  The CPS Claim is based on two promissory notes signed approximately two years apart by Resources, but not the Debtor.

7.      On January 17, 2005, the Debtor and the Committee filed their Objection to the CPS claim.  Orca and CPS have responded to that Objection, the Debtor and the Committee have replied.  Crown Oil Partners, L.P. ("Crown"), the largest undisputed creditor in the case, has also sought to intervene in the Objection to the CPS Claim.[1]

8.      The CPS Claim is treated as both a Class 2(b) claim and a Class 4 claim under the Plan.  To the extent the assets purporting to secure the CPS Claim have been sold pursuant to Section 363 of the Code, CPS, or its assignee, shall receive nothing under the Plan on account of its allowed secured claim.  To the extent the CPS Claim is allowed, CPS will be treated as an unsecured creditor like all other creditors with allowed unsecured claims in Class 4.  Such creditors will receive a pro-rata distribution of all cash of the Estate.

---

[1]Claims objections are addressed in paragraph 6.4 of the Plan, which provides for the allowance of claims and interests.  Significantly, in subparagraph 6.4(a), the Plan provides that any party-in-interest may initiate appropriate proceedings to object to any Claim or Equity Interest and that any Claim or Interest which is not disputed within thirty (30) days of confirmation will be deemed allowed.  Further, the Plan provides in paragraph 6.4(a)(I) that "the Debtor and Reorganized Debtor shall not commence an objection to a timely filed claim which is not identified as being disputed on the attached Exhibit A without written consent of the Committee."  Exhibit A to the Plan contains information on the creditor's name, the amount of claim, the objection amount, the objection description, and net claims paid.

2

9.      CPS and Orca have objected to the Plan. Their Objection argued that because the Plan did not attach an Exhibit A identifying those claims that were objectionable, the Debtor intended only to object to the CPS Claim. The Objection then argued that the Plan was not proposed in good faith because many of the Debtor's creditors appeared to have had contractual relationships with Resources and not the Debtor but that the Debtor was not prosecuting objections with respect to those creditors. At the hearing on this matter, counsel for CPS produced a list containing claims alleged to be Resources obligations (the "CPS List"). Counsel for CPS indicated that he believed that approximately $200,000 to $300,000 of claims were objectionable on the basis that the creditor had a contractual relationship with the Debtor.[2] In response to questioning from the Court, counsel for CPS further indicated that the cost of pursuing the objections to such claims would be hundreds of thousands of dollars.[3]

10.     Thus, the only objection raised with respect to confirmation of the Plan is an allegation that the Plan was not proposed in good faith. The Court finds that the Plan complies with Section 1129 of the Code in all other respects.

11.     The Court received testimony from two witnesses: Mr. Tom Stover and Mr. Joe Kagie. Mr. Tom Stover is the general manager of the Debtor. Mr. Stover is also a member and manager of Resources. Mr. Stover testified that he prepared Exhibit A-3 to the Disclosure Statement, which is a list of creditors asserting unsecured claims, the amount of the claims asserted, the amount of any objection to be made by the Debtor, and a short description of the basis for the claim objection. Exhibit A-3 indicates that there are several objectionable claims in addition to the CPS Claim and identifies a number of bases for such objections.

12.     Mr. Stover testified regarding Exhibit A-3 and the bases for objections or non-objections to various unsecured claims. Mr. Stover testified that with respect to each claim listed on Exhibit A-3 that he had made a determination with respect to whether or not each claim was properly a claim against the Debtor and whether the amount of such claim was correct. Mr. Stover acknowledged that certain claims were based on invoices issued by the creditor to Resources and not directly to the Debtor. However, Mr. Stover testified that he believed that these creditors held claims against the Debtor and that no objection should be made simply because the creditor had sent an invoice to Resources rather than the Debtor.

13.     Mr. Stover testified that the Debtor was the owner of various oil and gas properties and that Resources had acted as the contract operator for the wells in which the Debtor held an interest. Resources held no interest in the oil and gas wells owned by the Debtor. Instead, Resources' only interest was that of operator or agent.

14.     Mr. Stover testified that where goods or services were required for the oil and gas wells owned by the Debtor, Resources, as operator, would arrange for the goods or services to be

---

[2] Transcript of Hearing conducted on the afternoon of May 11, 2005, page 15, lines 24-25.

[3] Transcript of Hearing conducted on the afternoon of May 11, 2005, page 22, line 21 to page 23, line 1.

3

provided. In some instances, the vendor providing the goods or services would invoice Resources, while in other instances, the vendor would invoice the Debtor. Resources would attempt to have the invoices issued in the name of the Debtor, however, in several cases the vendors continued to invoice Resources. Whether the invoice was issued to the Debtor or Resources, the cost of the goods or services provided to the oil and gas wells owned by the Debtor was allocated to the Debtor on the books and records of the companies.

15.    Mr. Stover specifically responded to questions concerning the claims of several creditors to illustrate the types of services with which Resources contracted on behalf the Debtor. Such claims included the claims of MBT Marketing Services, Conner & Winters, and LaRoche Petroleum Consultants, each of which appeared on the CPS List as claimants with Resources obligations. Mr. Stover testified that Connor & Winters is a law firm which provided services to the Debtor. Mr. Stover further testified that Connor & Winters provided no services to Resources. Mr. Stover testified that MBT Marketing Services marketed the Debtor's hydrocarbons and that Resources had no producing oil and gas wells from which to market hydrocarbons. Consequently, Resources contracted with MBT Marketing Services solely for the purpose of marketing the Debtor's hydrocarbons. Finally, Mr. Stover testified that La Roche provided engineering reports for the Debtor. To the extent services where provided by La Roche for Resources, Resources paid for such services. The CPS List also contained production tax liabilities owed by the Debtor but listed as Resources obligations.

16.    Mr. Joe Kagie is one of the five members of the Committee and has extensive experience in the oil and gas industry. Mr. Kagie testified that the Committee had studied and analyzed Exhibit A-3 in more than one Committee meeting attended by CPS. He also explained that an oil and gas operator is either the direct owner of the oil and gas properties it operates or acts on behalf of the owner. He further testified that creditors who provided goods or services to the Debtor's Properties would have expected to be paid by the owner of the Properties and not the operator. He testified that an operator would typically not be independently liable for services provided to the owner of oil and gas properties. Mr. Kagie testified that under these conditions, he believed that it was not appropriate to object to the claims of creditors which had provided goods or services to the Debtor at the request of Resources acting as operator.

17.    Mr. Kagie also testified that he had suggested inclusion of a provision in the Plan which precludes the Debtor from objecting to claims not identified in Exhibit A-3 without the consent of the Committee. Mr. Kagie testified that the purpose of this provision was simply to provide some oversight power to the Committee with respect to those claims which might later be objected to by the Debtor.

18.    Mr. Kagie further testified that the Committee had voted to object to the CPS Claim. He testified that he and the Committee believed the claim to be objectionable because the documents surrounding the CPS transaction show that CPS made an intentional business decision to omit the Debtor as the maker on the two notes executed by Resources. Mr. Kagie made references to multiple lawyers involved before and after the CPS transaction, promissory

4

notes signed two years apart, and CPS' knowledge of Resources and the Debtor as separate entities as some of the bases for the Committee's analysis.

19.     The Court finds that the CPS claim is materially different in terms of type, character, purpose and amount from other unsecured claims.

20.     The Court's record also demonstrates that the CPS Claim is distinct from other unsecured claims in this case. Orca has sought to have the CPS Claim assigned to it. Because Orca executed a general release of all claims against the estate, the Debtor and the Committee assert that the CPS Claim is objectionable on that basis.

21.     Counsel for CPS argued that to remedy the alleged lack of good faith and disparate treatment, the Plan should be amended to treat the CPS Claim as an allowed claim. The Court finds that the asserted discrimination might also be remedied by objecting to those claims alleged to be Resources obligations and, importantly, under this Plan, any creditor is entitled to file such objections pursuant to Section 502(a) of the Bankruptcy Code.

## CONCLUSIONS OF LAW

1.     CPS and Orca object to confirmation of the Plan on the basis that CPS is being treated differently from similarly situated creditors, and as a result, the Plan is not proposed in good faith as required by Section 1129(a)(3)[4]. The cases addressing alleged unfair discrimination against creditors apply a four-part test to determine if discrimination in a proposed Chapter 11 plan is "unfair." *See In re Snyders Drug Stores, Inc.* 307 B.R. 889, 894-5 (Bankr. N.D. Ohio 2004); *In re Hoffinger Industries, Inc.* 321 B.R. 498, 505 (Bankr. E.D. Ark. 2005); *In re Union Financial Services Group, Inc.*, 303 B.R. 390, 421 (Bankr. E.D. Mo. 2003). The courts consider: (a) whether discrimination has a reasonable basis; (b) whether the debtor can carry out the plan without this discrimination; (c) whether discrimination is proposed in good faith; and (d) whether the degree of discrimination is directly related to the basis or rationale for such discrimination.

---

[4]Section 1129(a)(3) does not define good faith. *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984). The case law makes clear that a plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code. *Ryan v. Loui (In re Corey)*, 892 F.2d 829, 835 (9th Cir. 1989); *see also, Madison Hotel*, 749 F.2d at 425 ("For purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."). The requisite good faith determination is based on the totality of the circumstances. *Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*, 84 B.R. 167, 172 (9th Cir. BAP 1988).

The "good faith" requirement of Section 1129(a)(3) is not a completely open ended provision which allows a creditor to simply assert that any conduct of the Debtor lacks the requisite "good faith." The test for good faith under 11 USC § 1129(a)(3) is limited to a determination as to whether there is reasonable likelihood that plan will achieve result consistent with standards under 11 USCS § 1129. The test is based on the plan itself and its acceptance by the creditors. *In re Texas Extrusion Corp.*, 68 B.R. 712 (N.D. Tex. 1986), *aff'd*, 836 F.2d 217 (5th Cir. 1988).

2.      Cases such as *In re Snyders Drug Stores, Inc,. supra*, are readily distinguishable from the case at bar.  These cases deal with alleged discrimination between creditor classes in which creditors with similar claims are classified in different classes in a manner which is alleged to be unfair.  Under such circumstances, the cases hold that there is no unfair discrimination if the classes are comprised of dissimilar claims or interests.  Further, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for disparate treatment of creditor classes. *In re Union Financial Services Group, Inc.,* 303 B.R. at 421.

3.      Unlike *In re Snyders Drug Stores, Inc., supra*, in this case, the CPS Claim is classified with all other unsecured claims in Class 4.  If the CPS Claim is allowed, it will be paid on a *pro rata* basis just like all other unsecured claims in Class 4.  Instead, CPS and Orca's allegations of discrimination stem from the fact that the CPS Claim is the subject of an objection by the Debtor and the Committee.  The Court also granted Crown leave to intervene in that Objection.

4.      The Plan has no provision which provides for discriminatory treatment of the CPS Claim.   The objection to the CPS Claim was filed independently of the Plan and associated disclosure statement.  No provision of the Plan requires the Debtor and the Committee to object to the CPS Claim.  Indeed, the Plan expressly permits all parties in interest to object to claims.  Paragraph 6.4(a) of the Plan expressly provides:

> Subject to subpart (i) of this paragraph, any party in interest may initiate appropriate proceedings to object to any Claim or Equity Interest.

5.      To the extent CPS and Orca believe that objectionable claims exist, they are free to object to such claims. Consequently, there is no basis on which the Court can conclude that the Plan is discriminatory as to the CPS Claim.[5]

6.      Further, the undisputed evidence indicates that both the Debtor and the Committee made a reasoned decision with respect to those claims which should be objected to. This analysis of the claims objections is mandated by Sections 1106(a)(1) and 704(5) of the Code. [6]  In making the determination of which claims will be objected to, the Debtor is granted

---

[5] As note above, the economics related to the pursuit of the objections to claims is suspect. The estimated amount of claims subject to objection was estimated by counsel for CPS to be approximately $200,000-$300,000.  Counsel also stated that the cost of CPS pursuing the claims objection could be hundreds of thousands of dollars.

[6] Section 1106 of the Code requires a Chapter 11 Trustee to perform certain of the duties of a Chapter 7 trustee's imposed by 11 U.S.C. § 704. Among those duties are:

> (5) If a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper . . . .

reasonable discretion.  *See In re Riverside-Linden Inv. Co.*, 85 B.R. 107, 113 (Bankr. S.D. Cal. 1988), *aff'd*, 99 B.R. 439 (9th Cir. BAP 1989).  The Court must grant some deference to the decisions which are reached by the Debtor and the Committee with respect to those claims objections which are to be pursued at the expense of the estate.[7]  *See Frostbaum v. Ochs*, 277 B.R. 470, 475 (E.D.N.Y. 2002) ("Because the cost of collection efforts, or litigating a claim, are often more burdensome than beneficial, the 'business judgment' rule has been employed in a variety of bankruptcy contexts.")

      7.     In this case, there is no evidence that either the Debtor or the Committee acted in bad faith with respect to the manner in which the claims objections have been filed.  The undisputed testimony is that Mr. Stover, on behalf of the Debtor, reviewed the claims and identified those claims which he believed were objectionable.  In addition, Mr. Kagic testified that the Committee independently reviewed Mr. Stover's analysis and reached similar conclusions.

      8.     The decision of both the Debtor and the Committee not to object to those claims where goods or services were provided to Debtor, but invoiced to Resources is a reasonable decision.  The undisputed testimony by Mr. Stover is that Resources contracted for goods and services as operator of the oil and gas properties which were owned by the Debtor.  The relationship between the operator of a well and the owner of the well is one of agency. *See Reserve Oil, Inc. v. Dixon*, 711 F.2d 951 (10th Cir. 1983) (holding that "a trustee type

---

[7] While Section 1106 of the Code does not require a Chapter 11 Trustee to "close such estate as quickly and expeditiously as is compatible with the best interests of the parties in interest" as is required in a Chapter 7, such an obligation can be implied in this case since the Plan is a plan of liquidation.  As noted in *In re Riverside-Linden Inv. Co.*, a tension exists between the obligation to object to claims and the obligation to close an estate "quickly and expeditiously."  In *In re Riverside-Linden Inv. Co.*, the Court noted:

> Within these duties lies at least a latent conflict.  While the trustee is obligated to expeditiously close the estate in the best interests of the parties in interest, such a closing will often be delayed while the trustee objects to the claims of certain parties in interest. Clearly, "a purpose would be served" when there are other creditors who stand to benefit from the trustee's actions and such actions show a likelihood of increasing the total distribution to the creditors. However, there comes a point where such an investigation is either too costly to justify or beyond the scope of the trustee's duties. When a cost benefit analysis indicates that the only parties who will likely benefit from an investigation of a claim are the trustee and his professionals, investigation is unwarranted. A trustee, while having the right to investigate claims without court authority, must exercise this right judiciously.

*In re Riverside-Linden Inv. Co.*, 85 B.R. 107, 111 (Bankr. D. Cal. 1988).  *See also Frostbaum v. Ochs*, 277 B.R. 470, 475 (E.D.N.Y. 2002).

relationship imposing a duty of fair dealing between the operator and the non-operator owners.")[8] Under general principles of agency law, the Debtor is obligated for debts incurred by the well operator as agent. *In re Denver Community Dev. Credit Union*, 2004 WL 2274961 at *2 ("Under the law of agency, it is axiomatic that it is the principal who bears the liability for the acts of its agent where the agent acts on behalf of the principal and discloses that relationship.") *See also*, RESTATEMENT (SECOND) OF AGENCY §§ 144[9] and 186 (1958)[10]. At a minimum, substantial issues would exist with respect to whether the Debtor is obligated on the debts incurred by Resources, as operator, under theories of general agency.

9.      In addition, in any claims objection proceeding, substantial issues would also exist with respect to whether the Debtor is obligated for the reasonable value of the goods and services which it received under the doctrine of unjust enrichment. *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000) ("In Colorado, a plaintiff seeking recovery for unjust enrichment must prove: (1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying.") Here the undisputed testimony indicated that the creditors supplied the goods and services, and the Debtor actually received the benefit of the goods and services. While the record is not complete with respect to each claim, it appears that a creditor could forcefully argue that under these circumstances, it is unjust for the Debtor to retain the benefits of its services without paying.

10.     The Court will rule on the allowance of the CPS Claim, but the Court will not, under these circumstances, question the Debtor's and the Committee's decisions to object to

---

[8]An agency relationship arises from the "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *City and County of Denver v. Fey Concert Co.*, 960 P.2d 657, 660 (Colo. 1998)(*quoting* Harold Gill Reuschlein & William A. Gregory, The Law of Agency and Partnership § 2, at 4 (2d ed. 1990)).

[9]Section 144 of the RESTATEMENT (SECOND) OF AGENCY governs the liability of the principal with respect to the acts of a disclosed or partially disclosed principal. That Section imposes liability on the principal as follows:

§ 144 General Rule

A disclosed or partially disclosed principal is subject to liability upon contracts made by an agent acting within his authority if made in proper form and with the understanding that the principal is a party.

[10] Section 186 of the RESTATEMENT (SECOND) OF AGENCY governs the liability of the principal with respect to the acts of a undisclosed principal. That Section imposes liability on the principal as follows:

§ 186 General Rule

An undisclosed principal is bound by contracts and conveyances made on his account by an agent acting within his authority, except that the principal is not bound by a contract which is under seal or which is negotiable, or upon a contract which excludes him.

claims, as it is the prerogative of the Debtor and other parties in interest to object to claims under Sections 704(5) and 502(a) of the Bankruptcy Code.

11.    Even if the Court were to apply the four-part test recited above, the Plan would not be deemed unfair.  The Debtor and the Committee have objected to the CPS Claim on a reasonable basis.  They have articulated a reasonable basis for not objecting to claims which CPS alleges are Resources obligations since those claimants provided goods or services to the Debtor, while the Committee apparently believes that CPS made an intentional decision to omit the Debtor from the promissory notes which are the bases for the CPS Claim.  In addition, the Debtor and the Committee object to the CPS Claim if it is owned by Orca.  For these reasons, the Court finds that the alleged discrimination is in good faith.[11]

12.    Finally, were the Court to find that the objection to the CPS Claim is unfair, it could not order the Debtor, the Committee or Crown to withdraw their objection.  To eliminate the perceived discrimination, the Court would have to order the Debtor to object to claims which CPS believes are Resources obligations.  The Court is not prepared to enter such an order when the testimony reflects that the Debtor and the Committee have determined that such claims should not be the subject of objections and have articulated a rational basis for their business judgment.

13.    The Court concludes that the Plan has been proposed in good faith and otherwise meets the requirements of Section 1129 of the Bankruptcy Code.

## ORDER

WHEREFORE, it is HEREBY ORDERED that the Second Amended Plan of Reorganization proposed by the Debtor is hereby confirmed.

IT IS FURTHER ORDERED that the Debtor shall provide a copy of this Order to all creditors and parties-in-interest, and shall file a certificate of service regarding same with the Court.

Dated this 24 day of June, 2005.

BY THE COURT:

_____
Sidney B. Brooks,
United States Bankruptcy Judge

---

[11]In the *Snyders Drug Store* case, the court noted that the analysis in determining whether the discrimination is proposed in good faith is whether the discrimination primarily benefits the debtor without a corresponding benefit to creditors. *Snyders*, 307 B.R. at 896.  Here, the alleged discrimination will benefit the creditors, not the Debtor, and the Committee has joined the Debtor's objection to the CPS Claim.